# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| ROBERT JOHN FRECHETTE, et. al | Civil Action No.: 2:18-cv-03208-DCN |
| Plaintiff, | **REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FLSA CLAIMS** |
| v. | |
| ZIA TAQUERIA, LLC and KEVIN GRANT, individually | |
| Defendants. | |

## INTRODUCTION

Defendants do not dispute the existence of any prerequisites to liability under the FLSA; rather, the crux of Defendants' opposition is that, despite hiring restaurant managers to serve in a managerial capacity and act in Defendants' best interests, identifying them as "managers" to employees and customers, paying them a salary or hourly wage far exceeding the $2.13 hourly wage paid to front-of-the-house ("FOH") employees, admittedly giving them responsibility over restaurant operations and staff both in writing and practice, and entrusting them with special access and enhanced responsibilities, their "managers were not really managers." This not only defies logic and requires the Court to draw unreasonable inferences, but it is belied by the admissible evidence in the record.

## LEGAL ARGUMENT

### I. THERE IS NO GENUINE ISSUE OF MATERIAL FACT ON LIABILITY.

**A. Defendants Failed to Inform Employees of the Tip Pool Credit.**

As discussed below, the "evidence" Defendants proffer in opposition to FLSA liability fails to create a genuine issue of material fact. Regardless, their failure to address,

1

much less refute, the issue of lack of employee notice of the tip pool credit entitles Plaintiffs to summary judgment as a matter of law on the issue of liability. Roberts v. eBay, Inc., 2017 U.S. Dist. LEXIS 121577, *14, n.5 (D.S.C. July 14, 2017) ("a party's failure to address an issue in its opposition brief concedes the issue.").

As set forth in Plaintiffs' principal memorandum,[1] an employer must inform employees of the tip credit policy in order to take the tip credit. In discovery, Plaintiffs specifically asked Defendants "the manner in which employees were informed about the Tip Pool and related policies during the relevant time period." Dkt. No. 38-25, Ex. C, Cawley SJ Dec. (Interrog. No. 10). In their interrogatory answers, which were verified by Defendant Grant,[2] Defendants did not assert that employees were ever informed that "their tips will be used as a credit against the minimum wage permitted by law."[3]

Rather, Defendants solely referenced an unspecified meeting where FOH staff were informed that Managers would be included in the Tip Pool, with no indication that the impact of the tip credit on minimum wage obligations was also explained. Id. (Answer, Interrog. No. 10). In their supplemental answer, Defendants conceded notice of the tip credit policy was not provided until post-litigation: "In July 2019, a front of the house

---

[1] Compare Dkt. No. 38-1, p. 22 ("Further, in order to take the tip credit, the employer must (1) inform the employee of the tip credit…"); Id., p. 19 ("It was not until July or August 2019 that an explanation of the tip pool with references to the FLSA was posted in Zia restaurant."); Id. , p. 35 ("Where, as here, an employer failed to inform an employee of the tip credit provisions and retained a portion of employee tips, the tip credit is forfeited."), with Defs. Br. [Dkt. No. 46] at n.7 (erroneously asserting that Plaintiffs' motion does not address "whether Plaintiffs were sufficiently informed of the tip credit").

[2] Cawley Second SJ Dec., Ex. A.

[3] Prusin v. Canton's Pearls, LLC, 2017 U.S. Dist. LEXIS 183226, *9 (D. Md. Nov. 6, 2017) ("The employer 'bears the burden of showing that it satisfied the FLSA's notice requirement by, for example, providing employees with a copy of § 203(m) and informing them that their tips will be used as a credit against the minimum wage as permitted by law.'").

2

manager Ashley Love Stephenson posted a notice [ ] that detailed the Defendant's obligations and employees' rights under the Fair Labor Standards Act." Id. This is consistent with evidence that the July 2019 poster "was the first time during my five years at Zia restaurant that I observed anything posted regarding the FLSA or explaining the Tip Pool." Tinnin Dec., ¶ 43 [Dkt. No. 38-2].

Similarly, in Defendant Zia's verified answer regarding policies and procedures for ensuring compliance with the FLSA, it was generically stated that "notice to employees of their rights was also posted on labor posters in the restaurant." Id. (Interrog. No. 7). The mere presence of labor posters in the restaurant is inadequate to satisfy Defendants' burden of showing that Plaintiffs were informed of the affect of the tip credit on minimum wage:

> Here, Defendants fail to point to any evidence in support of their claim that they provided Plaintiff notification of the tip credit. Defendants rely entirely on their display of "labor law posters" in the restaurant during Plaintiff's employment and one offhand comment by Defendant Hamilton during his deposition testimony. The Court first turns to the posters. Assuming *arguendo* that the posters were displayed during the relevant period, and that displaying a poster with language that tracks the tip credit provisions of the FLSA and MWHL is alone sufficient to satisfy the statutory notice requirement, Defendants have still failed to present a genuine issue of material fact. Defendants contend merely that they received a "labor law poster" from Paychex once a year, which they posted in an area that was "conspicuous to all employees, including servers." However, Defendants have not identified any relevant language (or for that matter any language at all) on these posters that would satisfy the tip credit notice requirement.

Prusin, 2017 U.S. Dist. LEXIS 183226 at *9. Because the undisputed evidence in the record confirms that Plaintiffs were not informed of § 203(m), or Defendants' intention to use that provision to satisfy minimum wage obligations, Plaintiffs are entitled to summary judgment on FLSA liability.

3

### B. Zia Managers were Statutory "Employers" under the FLSA.

Both before and after the March 2018 amendment to the FLSA, "[t]he practice of forced sharing of tips with management is an illegal practice, regardless of whether the members of management are also engaged in services that could be the subject of tipping."[4] Thus, even assuming that the failure to inform employees of the tip credit was not dispositive of Defendants' FLSA liability, their argument that Managers lacked the level of control to constitute statutory "employers" is fundamentally flawed.

#### 1. Defendants rely on self-serving "sham" affidavits.

Defendants rely almost exclusively on the Affidavits of Grant and William Smith ("Smith") to rebut Plaintiffs' evidence of the control exercised by Managers (including Plaintiffs' firsthand observation of same). These self-serving "sham" affidavits fail to create genuine issues of material fact and should be disregarded[5] in deciding this motion.[6]

##### a. Lack of corroborating evidence.

The Affidavits aver that, during the relevant time period, Grant exercised total managerial and supervisory control and authority over every aspect of FOH employee

---

[4] Beaudry v. Emperor's Gentleman's Club, Inc., 2015 U.S. Dist. LEXIS 178020, *2-3 (M.D. Fla. Apr. 6, 2015); see also Salim Shahriar v. Smith & Wollensky Rest. Grp, Inc., 659 F.3d 234, 240 (2d Cir. 2011) ("[A]n employer loses its entitlement to the tip credit where it requires tipped employees to share tips with (1) employees who do not provide direct customer service or (2) managers.").

[5] Specifically, Grant Aff. at ¶¶ 12, 19, 24, 32-35, 40, 45-46, 51-52; Smith Aff. at ¶¶ 7-19.

[6] Grace v. Family Dollar Stores, Inc., 637 F.3d 508, 512-513 (4th Cir. 2011) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."); Askins v. Starting Point, 2014 U.S. Dist. LEXIS 112737, *5 (D.S.C. Aug. 14, 2014) (party opposing summary judgment cannot rely on conclusory allegations to defeat motion); Perez v. Work Servs., 2017 U.S. Dist. LEXIS 215030, *22 (D.S.C. Feb. 14, 2017) ("In the absence of other corroborating evidence, [ ] self-serving declarations or affidavits do not suffice to allow a party to defeat summary judgment."); Kinser v. United Methodist Agency, 613 Fed. Appx. 209, 210-211 (4th Cir. 2015) ("At the summary judgment stage, if an affidavit is inconsistent with the affiant's prior deposition testimony, courts may disregard the affidavit pursuant to the sham-affidavit rule.").

scheduling, compensation, discipline, hiring and firing, recordkeeping, and policies.[7] This control was allegedly exercised by Managers transmitting the schedule to Grant for final review, changes, and approval; employees transmitting schedule changes to Grant (either directly or through a Manager) in person or via availability forms, notes, or electronic requests; Managers seeking approval from Grant to issue corrective actions or to discipline an employee beyond sending him/her home from a shift; Managers providing interview impressions to Grant and seeking permission to hire or fire employees; and Managers receiving policy directives from Grant and communicating same to same employees.[8]

Conspicuously, these self-serving, conclusory averments are uncorroborated by any evidence. Perez, 2017 U.S. Dist. LEXIS 215030 at *22 (absent corroborating evidence, "self-serving declarations or affidavits do not suffice to allow a party to defeat summary judgment"). After three rounds of document requests, Defendants' entire production consisted of a mere thirty-two text messages (only a handful of which involved managerial or operational matters), no emails, no telephone records, no draft schedules, schedule revisions, or schedule change requests (formal or informal), no communications or documents involving discipline, hiring or firing (except those texts attached to Defendants' Affidavits)—a far cry from the constant communication between Grant and Managers that would be necessary to sustain averments of his exclusive, all-encompassing control given his absence from the restaurant on nights and weekends. Cawley Second SJ Dec., Ex. D.[9]

---

[7] Dkt. No. 46-1 at ¶¶ 12, 19, 24, 32-35, 40, 45-46, 50-52; Dkt. No. 46-12 at ¶¶ 7-19.
[8] Grant Aff. [Dkt. No. 46-1], ¶¶ 12, 32-36, 45-46, 51-52; Smith Aff. [Dkt. No. 46-12], ¶¶ 7-19.
[9] The "manager log," which Defendant Grant admitted was largely abandoned as a communication tool, also contained significant gaps (such as a six-month gap in 2018)[9] in entries. Grant Dep. Tr., p. 59:2-16.

Despite testifying that one of his primary methods of communications with Managers during the relevant time period was through text messages (as observed by Plaintiffs),[10] Defendants' production contained only five text messages between Grant and Smith and no text messages between Grant and any other former or current full-time Zia Manager identified in their verified discovery responses. Notably, Grant testified affirmatively that "if a manager had texted you in the last three years," he would have retained and produced the text.[11] The absence of corroborating business records to support the theory that Grant solely managed and supervised every aspect of Zia restaurant (despite undisputedly hiring and compensating Managers to perform those functions)[12] is admissible evidence of the non-occurrence of his purported oversight, supervision, and management activities. Pugh v. Louisville Ladder, 361 Fed. Appx. 448, 457 (4th Cir. 2010) (under Rule 803(7), absence of business records proof of nonoccurrence of event).[13]

### b. Averments contradicted by evidence.

The conclusory averments regarding Grant's purported total and exclusive managerial control and Zia Managers' alleged "low-level supervisory" role also fail to

---

[10] See Cawley Second SJ Dec. at Ex. B (Grant Dep. Tr., p. 59:21-60:11); see also Dkt. Nos. 38-2-38-20.

[11] Grant Dep. Tr.,106:5-25.

[12] Cawley SJ Dec. at Ex. E (restaurant manager offer letters).

[13] The utter lack of such records is particularly problematic for Defendants' opposition because Grant admitted that he was not present in Zia restaurant on evenings or weekends, and even a rough estimate of his travel during the relevant time period revealed weeks of time away from Zia restaurant in any given year (including international travel). Id. (Grant Dep. Tr., 32:22-25; 115:11-117:25). While purportedly in communication with Managers via text message, telephone, and email during his travels, Defendants' document production is devoid of any such communications. Cawley Second SJ Dec. at Ex. B (Grant Dep. Tr., p. 118:4-119:1: Q: When you were traveling, were you in communication with your managers at Zia? A: Yes. Q: How did you communicate with them? A: Through the same methods I communicate with them locally. Q: So text messages? A: Text messages, phone calls. If I was someplace international where phone service was sketchy, then I would tell them to contact me through e-mail. Q: Do you recall if you produced any text messages from communications during these trips you described? A: I don't know. Q: Okay—but if you---if the existed, you would have produced them? A: Yes, absolutely. Q: Same with the e-mails? A: Um-hum. Q: If the existed, you would have produced them? A: Oh, yeah.).

6

create a genuine issue of material fact because they are contradicted by testimony, verified discovery responses, and business records. For example, both Grant and Smith's Affidavits describe Managers (including Smith as General Manager) as "low-level supervisors."

In contrast, the offer letters that Grant authored and provided to Managers defined their role as "of utmost importance to our success and it is critical that we have the best managers to represent Zia's core values" and tasked them with "operat[ing] the dining room, staff, and customers at the highest level." Grant testified that Managers were responsible for "operating the business to serve the customers" and "[m]aintaining all the standards that a customer would expect walking into any restaurant." He testified that the "manager" position "entail[ed] making sure that they [staff] are there for their shift, ready for their shift, smiling brightly, offering exceptional service throughout their shift, and following the guidance and leadership of the manager on duty." Grant Dep. Tr., p. 84:17-85:3. He also acknowledged that "[t]hey [Managers] worked at the restaurant a lot like I did, so they had firsthand experience of things that as a team we were looking to improve." Id., 112:5-113:8.[14] Consistent with Defendants' articulation of their roles and the unrebutted facts in Plaintiffs' declarations, Managers undisputedly had higher-level access and duties satisfying the economic reality test,[15] including:

---

[14] In discovery, Plaintiffs asked how Zia Managers were compensated. Defendants responded that they were paid a high hourly rate or a salary without mention of overtime compensation; thus, the only reasonable inference is that Defendants considered Managers to have enough managerial responsibility to constitute exempt executive employees under the FLSA. Ex C, Cawley SJ Dec.

[15] While the material issue of managerial control is informed by the economic reality factors, "no one factor or set of factors is decisive" and the factors "are not etched in stone and will not be blindly applied." Jackson v. Mayor & Balt. City, 2009 U.S. Dist. LEXIS 59787, *7-8 (D. Md. July 14, 2009) ("These four factors 'provide a useful framework for analysis in this case, but they are not etched in stone and will not be blindly applied. The ultimate determination must be based upon the circumstances of the whole activity.'") (citations omitted). Defendants' myopic focus on the authority to hire and fire employees is misplaced because the record is undisputed that, during the relevant time period,

7

- Access to the secure "operations module" of the Restaurant365 application (Grant Dep. Tr., p. 108:17-109:6);
- Handling invoicing and entering invoices into the secure system (Id., p. 26:18-20);
- Entering AP transactions into the secure system (Id., p. 109:3-6);
- Performing liquor inventory (Id., p. 127:17-19);
- Performing inventory on clothing sold at Zia restaurant (Weakley SJ Dec., ¶23-24);
- Assisting with mandatory staff meetings (Id., p. 112:5-113:8);
- Authority and discretion to "cut" mid-shift FOH employees based on restaurant volume (Id., p. 93:20-94:12);
- Responsibility for monitoring employee overtime (Id., p. 40:16-19);
- During the relevant time period, exclusive responsibility for balancing cash drawers and performing "cash out" procedures (Id., p. 88:22-89:5; 91:16-92:7);[16]
- During the relevant time period, completing, saving and maintaining Tip Cards after every shift (Id., p. 88:22-89:25; 99:12-22);
- Compiling and initialing sales slips from the POS (Id., p. 91:16-92:7);
- Distributing tips to FOH employees and maintaining undistributed tips in the safe for later disbursement (Grant Aff. at ¶ 28);
- Exclusively performing "comps," voids and otherwise adjust customers orders, checks and payments on the POS system for each shift (Tinnin SJ Dec., ¶14);
- Exclusively handling customer complaints/problems for each shift (Grant Aff., ¶ 4);
- Adjusting FOH employee clock-in and clock-out times (Weakley SJ Dec.,¶ 20);
- Closing "comps" and "voids" in the POS system to permit FOH employees to close out (Id., p. 90:20-91:1);
- Access the "manager log" communication system available only to Grant and Managers to relay operational and supervisory information (Id., p. 58:10-59:2);
- Access to safe and cash, and authority to bank for Defendants (Tinnin SJ Dec., ¶ 21);
- Communicating restaurant policies and procedures to employees (Id., p. 55:18-23).

Grant also averred that his exclusive control and access extended to Zia's financial and personnel records, and that Managers had no access to same. Grant Aff., ¶¶ 23-24. The record confirms, however, that Zia Managers admittedly created, maintained and had

---

there was minimal turnover in the FOH staff and only two or three FOH employees were terminated. Grant Dep. Tr., p. 34:11-35:21; Cawley Second SJ Dec., Ex. C (Tinnin Dep. Tr., 59:3-8)

[16] Grant Dep. Tr., p. 88:22-89:10 ("Q: At some point it was exclusive that managers would create the tip cards? At some point, you know, I brought managers in full-time open to close because my staff was unable to meet the standards that I was trying to set forth. And so, yes, at some point the manager started taking over reviewing the drawers at the end of the night for accuracy and handling the tip cards for the staff. Q: Okay. When you say reviewing the drawers, what does that entail? A: Involves counting them to make sure that they were what we distributed to the staff at the beginning of their shift.").

access to Tip Cards and sales slips, had access to and the ability to modify employee time records; and accessed and utilized employee availability forms to create schedules. Defendants' business records also confirm that Smith had access to labor reports, which are "comprehensive with respect to employees' hours and pay," and include employees' "clock-in and their clock-outs," declared tips and overtime. Grant Dep. Tr., p. 39:12-40:9.

While Grant averred that Managers lacked authority to issue written corrective actions without his "express approval," he testified to the following: "Well, actually, occasionally I think they [Managers] might have. I can't recall exactly. I've wished at times that they [Managers] would address some of those issues for me, but for the most part the managers don't want to write people up for things." Id., 57:12-17. Similarly, Grant averred (¶ 35) that he approved all schedule changes; yet, he testified that FOH employees routinely did not obtain his approval and Managers could initial schedule changes. Id., p. 41:10-24.

### 2. Defendants' argument disregards the evidence in the record.

Once the self-serving portions of Defendants' Affidavits are disregarded, the only reasonable inference from the record is that Managers exercised sufficient control, supervision, and authority over operations and FOH employees such that they constitute statutory "employers." Perez, 217 F.Supp.3d at 877 (individual "need not supervise, control, or otherwise exercise authority continuously over the employees to be an employer;" "control may be **restricted**, or exercised only **occasionally** without removing the employment relationship from the protections of the FLSA.") (emphasis added).

Defendants undisputedly hired individuals as "managers" to "manage" the restaurant as understood in common experience and parlance in order for Grant to spend

9

less time at the restaurant in a managerial capacity. Cawley SJ Dec., Ex. E (offer letters); Grant Dep. Tr., p. 21:2-9; 27:3-28 ("It [hiring managers] started off with me hiring like a floor assistant, somebody that worked for me, me going, hey, I'm here way too much, I can't live here anymore[.]"); Tinnin SJ Dec., ¶¶ 11-12 ("Around October 2015, Zia's owner, Kevin Grant ("Kevin"), told me that his 'whole goal in hiring Billy and Kenny is to not have to be in the restaurant at all.'").[17] Grant's testimony confirmed that Managers specifically applied for manager positions as opposed to FOH positions; hence, their much higher compensation.[18] Id., p. 146:12-16. This alone readily distinguishes Defendants' cited cases, which involve individuals alleged to be "employers" under the FLSA who, first and foremost, worked FOH positions that "customarily and regularly" received tips but also performed some managerial tasks ancillary to those positions.[19]

It is also undisputed that, in practice, Zia Managers operated and managed the restaurant in Grant's absence. Grant testified that he was only present at the restaurant on weekdays and, even then, there was another Manager on duty. Id., p. 36:1-8. During the restaurant's busiest times—evenings and weekends—Managers necessarily controlled operations and employees' work. Given Grant's schedule, the restaurant could not (and, on

---

[17] Fed. R. Evid. 801(d)(2)(A).

[18] Indeed, when Grant utilized FOH employees to perform managerial duties, they received a separate, much higher hourly rate. Cawley Second SJ Dec. at Ex. B (Grant Dep. Tr., pp. 66:3-67:6; 68:1-69:4; 77:18-79:11) (Schrott made $2.13 per hour as Bartender and $20.00 per hour when assisting as inventory and FOH managers)

[19] Rudy v. Consol. Rest. Cos., 2010 U.S. Dist. LEXIS 92764, * (N.D. Tex. Aug. 18, 2010) (determining whether individuals employed as **maître ds** but with greater responsibilities than regular servers were employers); Morgan v. Speak Easy, LLC, 625 F.Supp.2d 632, 652 (N.D. Ill. 2007) (determining whether **senior servers** with some additional responsibility were statutory employers); Strange v. Wade, 2010 U.S. Dist. LEXIS 93321, *20 (S.D. Ohio Sept. 8, 2010) (determining whether an individual hired as a **maître d** and performing those and some additional functions was a statutory employer); Dole v. Cont'l Cuisine, Inc., 751 F.Supp. 799, 802 (E.D. Ark. 1990) (determining whether **maître d** constituted statutory employer) (emphasis in bold added).

occasion, did not) operate without Zia Managers.[20] These circumstances are distinguishable from Rudy, a case upon which Defendants heavily rely, where the owner "was present at Silver Fox **95% of the time it was open**—approximately 42-48 hours a week." 2010 U.S. Dist. LEXIS 92764 at *16 (emphasis added).

Zia Managers were solely responsible for addressing customer complaints and issues during a shift, with exclusive authority to "comp," void, or adjust customer checks, orders, and payments. While Defendants attempt to leverage this customer interaction to justify Zia Managers' inclusion in the tip pool, this ignores that restaurant managers do not "customarily and regularly" receive tips from customers.[21] In contrast, the cases cited by Defendants involved whether employees who undisputedly "customarily and regularly" received tips as a maître d, senior server, or bartender were properly characterized as an "employer" for assuming responsibilities outside of their tipped positions. See supra, n.13.

Both the expectation and reality were that Managers stood in Grant's shoes and acted in Defendants' best interests. Grant Dep. Tr., 45:17-46:7. As Grant testified, "I brought managers in full-time open to close because my staff was unable to meet the standards that I was trying to set forth." Id., 88:22-89:10; 126:24-127:12. Managers were responsible for implementing his "wishes and demands" and reiterating his "expectations" on all aspects of operations, from cleanliness to customer service. Id., 42:8-18; 45:17-20.[22]

---

[20] Dkt. No. 38-17 [Frechette Dec., ¶ 20].

[21] Montano v. Montrose Rest. Assocs., 800 F.3d 186, 195 (5th Cir. 2015) ("Conversely, a restaurant's owner or manager might spend much of the evening asking customers how their meals were, but customers never tip him for his interaction.").

[22] Cf. Davis, 38 F.Supp.2d at 716 ("This conclusion is bolstered by the fact that the record supports a reasonable inference that Butler was acting in his own interests, and not in the interests of the employer as required by the statute, when he accepted (and presumably retained) tips from customers and participated in a tip pool arrangement[.]"). As

11

### 3. Defendants' iteration of the economic reality test should be rejected.

In apparent recognition of their untenable arguments, Defendants rely almost exclusively on authority in other jurisdictions to support their premise that Zia Managers were not statutory employers. Dkt. No. 46, p. 19-25. The reason for this approach is readily apparent; namely, those jurisdictions have adopted a narrower "economic realities" test requiring the individual alleged to be an employer to have "control over the policies or conduct that allegedly violates the FLSA." Id., p. 20-21. A review of case law in this Circuit, however, revealed no cases requiring that the level of control exercised by the particular individual must be specifically tied to the alleged FLSA violation, nor have Defendants cited any such cases. Courts in this jurisdiction interpret the expansive statutory definition of "employer" broadly and do not limit it to "the common law sense[.]"[23]

Regardless, Zia Managers constitute statutory "employers" even under Defendants' narrower interpretation. Zia Managers undisputedly had some level of control over the FLSA notice violation. Defendants' Affidavits confirm that Managers were "responsible" for communicating Defendants' policies to employees. Grant Aff., ¶ 50-52; Smith Aff., ¶14. The record is devoid of any evidence that Managers, who were responsible for "training new front of the house staff" (¶ 12) communicated the tip credit policy to

---

such, the record is undisputed that they were Plaintiffs' "bosses" and exercised authority over the FOH employees consistent with their alignment with Grant. In exchange, they received significantly higher compensation.

[23] Alston v. DIRECTV, Inc., 2015 U.S. Dist. LEXIS 67002, *8 (D.S.C. May 22, 2015) ("The FLSA defines 'employer' as 'any person acting directly or indirectly in the interest of an employer in relation to an employee.' Courts have further noted that the definition of 'employer' is not limited in the common law sense, but is interpreted expansively to account for those who exercise control over the nature, structure, and economics of the employment relationship."); Rivera v. Mo's Fisherman Exch., Inc., 2018 U.S. Dist. LEXIS 72857, *23 (D. Md. May 1, 2018) ("The Fourth Circuit has stated that the FLSA 'should be broadly interpreted and applied to effectuate its goals,' and the definition of 'employer' is already broad.") (citation omitted).

Plaintiffs or FOH staff. Defendants confirmed in their verified answers that a poster explaining the tip credit policy was not posted by a Zia Manager until July 2019.

Further, Zia Managers played a material role in the implementation and enforcement of Defendants' mandatory Manager tip out policy. During the relevant time period, Managers were exclusively responsible for accurately inputting the requisite sales and tip information into the Tip Cards after each shift, maintaining the Tip Cards, and distributing tips to Plaintiffs. Their authority to adjust customer checks, orders, and payments impacted the sales figures from which the Tip Card calculations were formulated. Similarly, Managers had discretion to "cut" a mid-shift FOH employee early, which resulted in the Manager and the remaining FOH employees receiving more tips.

## II. NO GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WILLFULNESS.

In an attempt to avoid summary judgment as to their willfulness and lack of good faith in violating the FLSA, Defendants argue that the issue is premature. However, Plaintiffs are not asking the Court to consider the issues of willfulness and good faith separate and apart from Defendants' FLSA liability. This motion seeks partial summary judgment as to Defendants' FLSA liability and, if liability is established as a matter of law, a determination of Defendants' willfulness and lack of good faith as to the violations. This is the approach taken by plaintiff in Sellers v. Keller Unlimited, 388 F.Supp.3d 646 (D.S.C. 2019), in which summary judgment was granted as to both FLSA liability and willfulness.

As in Sellers, the record is undisputed that Grant engaged "in a pattern of conduct in reckless disregard for the legal constraints that the law imposes on an employer who avails himself of the tip credit." Id. at 652. Importantly, Grant's Affidavit is insufficient to

13

rebut Plaintiffs' statements that they observed firsthand Shawn Hagen and Travis Snowden raise the illegality of the mandatory manager tip pool policy at the January 2015 implementation meeting,[24] or the evidence that Snowden subsequently presented Grant with information (including legal analysis from the DOL website) about the illegality of the policy. Grant also fails to rebut that, during the conversation with Snowden, Grant stated: "I don't think it's illegal but if it is and does become an issue, I'll just tell them the my managers are employees just like everyone else," the very defense raised in this case.[25]

Rather, Grant merely avers that he does not have "**any recollection** of any employee raising this issue to me during the January 2015 meeting. I have **no recollection** of an employee named Travis Snowden ever raising a concern to me that the Front of the House Managers' participation in the tip pool could be illegal." Grant Aff., ¶ 56.[26] It is well-settled that "[a] party opposing a properly supported motion for judgment cannot create a genuine factual dispute simply by claiming that he does not recall a particular fact upon which the moving party has presented affirmative evidence."[27]

On this basis alone, the record contains undisputed evidence that Defendants were on notice of the applicable law, given specific warnings about their potential FLSA

---

[24] Tinnin SJ Dec. at ¶ 30; Snowden SJ Dec. at ¶ 23, Noble SJ Dec. at ¶ 6; Schrott SJ Dec. at ¶ 22 [Dkt. No. 38].
[25] Snowden SJ Dec. at ¶¶ 25-31; Tinnin SJ Dec. at ¶ 33.
[26] Grant's Affidavit is also self-serving in its attempt to retract Defendant Zia's verified interrogatory answer identifying "a comment made to Chris Long around the time of the implementation of the Front of the House/Assistant Dining Room Manager tip out by a bartender named Kat Markham about the tip out's possibility illegality." Cawley SJ Dec., Ex. C. Zia's answer did not indicate that this comment occurred after commencement of litigation (as Grant now avers at ¶54). In discovery, Grant was asked about any conversations regarding the subject matter of this lawsuit, including with Chris Long, but his verified response does not identify a post-litigation conversation with Long or anyone else regarding Ms. Markham's complaint.
[27] Hatfield v. Occidental Chem. Corp., 1988 U.S. App. LEXIS 20520, *13 (4th Cir. Mar. 21, 1988); Kraft Real Estate Invs., LLC v. HomeAway.com, Inc., 2012 U.S. Dist. LEXIS 8282, *21 (D.S.C. Jan. 24, 2012) ("testimony that an individual 'does not recall' is not sufficient to create a genuine issue of material fact").

14

violations, and Grant created a "scheme" to cover-up those violations. Williams v. Md. Office Relocators, LLC, 485 F.Supp.2d 616, 621 (D. Md. 2007). Further, based on Defendants' verified answers to interrogatories, no investigation was ever done with respect to any "complaints" regarding the mandatory manager tip pool policy despite Hagen and Snowden's statements regarding the illegality, Snowden's presentation of specific information as to the applicable law, and Defendant Grant's own admission that "[s]ince the implementation…individuals employed in the Counter, Bartender, and Floor Assistant Positions would occasionally complain to me about the tip pool policy[.]" Grant admittedly did not consult with counsel about same until after this litigation was filed.[28]

### III.     THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO DAMAGES.

Defendants do not dispute the methodology, formula, or documentation from which Plaintiffs calculated their damages (Dkt. No. 28-19); rather, Defendants attempt to create a fact issue by asserting that Managers did not receive a portion of the tip pool "between 13% and 14% of the shifts worked by Plaintiffs" and therefore the damage calculation must be adjusted. Defendants cite no legal authority for the proposition that an invalid tip pool and the tip credit can be resurrected on a piecemeal basis. Regardless, Defendant Grant's averment in this regard speculative and conjectural as he describes this figure as both "preliminary" and "approximate." Grant Aff., ¶ 59. Further, he does not cite to nor provide the "relevant payroll records" from which he derived these imprecise calculations. Id.[29]

---

[28] Cawley SJ Dec., Ex. D (Answer to Interrog. No. 13); Grant Aff., ¶ 57; Grant Dep. Tr., p. 63:9-22.
[29] Fed. R. Civ. P. 56(c) ("[a] party asserting that a fact is genuinely disputed must support the assertion by…citing to particular parts of materials in the record, including…documents").

Finally, to the extent the documents were too voluminous to provide, Defendants did not properly invoke Fed. R. Evid. 1006.

## CONCLUSION

For the reasons set forth herein and in Plaintiffs' principal memorandum, the present motion for partial summary judgment should be granted in its entirety as to liability, willfulness and lack of good faith, and damages.

Respectfully submitted this 10th day of January, 2020

**MHC LAW, LLC**

/s/Molly R. Hamilton Cawley
Molly R. Hamilton Cawley
(Fed. ID # 11838)
Casey M. Martens
(Fed. ID #12812)
MHC Law, LLC
460 King Street, Suite 200
Charleston, SC 29403
Tel: (843) 225-8651
molly@mhc-lawfirm.com
casey @mhc-lawfirm.com

*ATTORNEY FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Reply Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment was served via ECF on the following attorneys of record:

Allan R. Holmes, aholmes@gibbs-holmes.com
Cheryl H. Ledbetter, cledbetter@gibbs-holmes.com
Rebecca J. Wolfe, rwolfe@gibbs-holmes.com

/s/Molly R. Hamilton Cawley